## JOSEPH DYER *versus* CHAUNCY HUNT ET A.

To bring a case within the statute, which prohibits the bringing of poor persons, who have no settlement here, from another state into any town in this state, it must appear that the intention was to leave the persons so brought, a charge upon the town or the state.

It is a general rule, that the law of the place where a contract is made, is to govern as to its nature, validity, construction and effect. But if from the nature of the contract or its terms, it appears that it was to be executed in another country, then the place of the making becomes immaterial, and the validity of the contract is to be tested by the laws of the country where it is to be executed.

Overseers of the poor in another state, have no authority, as such, to bind out poor children as apprentices in this state.

THIS was an action on the case for enticing away N. W. Tucker, an apprentice of the plaintiff on the 21st January, 1828.

The cause was tried at May term, 1830, upon the general issue, when it appeared in evidence, that N. W. Tucker, was the son of Nathaniel Tucker, of Norwich, in the State of Vermont; that he was born in the year 1820; that his father and mother were settled in the town of Norwich, in the year 1822; that the father and mother, in that year separated, and have never cohabited together since that time; that the apprentice, when his father and mother separated, went to live with his grandfather, in Norwich, where he remained until the 13th November, 1822, when his mother made application to the overseer of the poor of Norwich, for the support of the said apprentice, which was accordingly furnished until the 25th February, 1823. The apprentice was then delivered to his mother, who went with him to reside among the shakers in Enfield. This was done under an understanding between the plaintiff, the mother of the apprentice, and the overseer of the poor of Norwich, that the plaintiff should have no claim against Nor-

wich for the support of the boy while at Enfield, and that if the boy should be brought back, the overseer should receive him. But the overseer neither consented nor objected, to the removal of the boy to Enfield. The plaintiff was a shaker, residing at Enfield, and it was understood, when the boy was delivered to his mother, that the overseer should bind him to the plaintiff if the latter should conclude to take the boy as an apprentice.

On the 3d of July, 1823, the plaintiff went to Norwich and told the overseer of the poor that he was ready to take the boy as an apprentice by indenture, and that if the boy was not bound to him that he would return the boy to Norwich ; and thereupon the overseer, the boy still remaining at Enfield, bound the boy by indenture, as an apprentice to the plaintiff, until he should arrive at the age of twenty-one years.

It also appeared that the boy was taken away from the plaintiff, by the defendants, and carried back to Vermont.

It was contended, on behalf of the defendants, that an overseer of the poor in Vermont, had no authority to bind a poor child to a person residing out of the state ; that it was illegal to bring the child into this state, and to take him as an apprentice ; that admitting the overseer had authority to bind a poor child to a person residing out of the state, he had no authority to bind this child.

A nonsuit was entered by consent, subject to the opinion of the court upon the foregoing case.

*L. Woodbury* and *Bell*, for the plaintiff.

*E. R. Olcott*, for the defendant.

The overseer of the poor in Norwich in Vermont had no authority to bind out, in this state, a poor child. The statute of Vermont, under which he acted, declares "that the overseers shall make the contract equitably and for the benefit of the person so bound out ; and the overseers shall inquire into the usage and treatment of all

persons by them, or their predecessors bound out, and shall endeavor to redress any wrongs or injuries they may sustain." Now if the overseer can bind out a child in New-Hampshire, he may, by the same authority, bind out a child in Georgia, or China. But it was most manifestly the intention of the statute, that the persons bound out by overseers of the poor should be so placed, that the overseers could see the conduct of those to whom they are bound. Upon this point we rely with great confidence on the following authorities. 2 D. & E. 726, *The King* v. *St. Nicholas*; 1 Burns Jus. 66; 2 Pick. 358, *Coffin* v. *Basset*; 1 Dane's Ab. 257; 1 Salkeld, 66—68; Reeve's Dom. Relations, 345; 8 Mass. Rep. 299; Hobart, 134; 6 Binney, 202. We further contend, that the child was illegally brought into this state. Whether a person removing from Vermont to this state might legally bring with him a poor person, his apprentice, is a different question. This child was not an apprentice when brought here; but was brought here only under pretence of becoming an apprentice, should the overseer and Dyer agree. If such pretences shall find any favor here, this state may be filled with poor persons from other states, notwithstanding the prohibitions of our statute.

But, admitting that the overseer had authority to bind the child to a person in this state, had he authority to bind under the circumstances of this case? We think not. When the indentures were made, the child was in this state, and not chargeable on Norwich. What authority, then, had the overseer of the poor in Norwich, to bind a child thus situated? None. He had no more right to bind this child than he had any other child in this state.

RICHARDSON, C. J. delivered the opinion of the court.

One question in this case is, whether the bringing of the pauper, for such the child was, into this state, was not illegal, and the indentures void on this ground. The letter of the statute imposes a penalty upon any person,

who knowingly brings and leaves, or with intent to leave, a pauper who has no settlement here, from another state, into any town in this state. But we are of opinion, that the intent of the statute was to prohibit the bringing of paupers into the state and leaving them, or with intent to leave them, a charge upon some town, or upon the state ; and that as there could have been no intent to leave the child a charge upon the state in this case, it is not within the statute. 16 Mass. Rep. 393, *Greenfield* v. *Cushman.*

It then becomes necessary to determine, in this case, whether the overseer of the poor had authority to bind the child, under the circumstances of this case, and whether the authority, if he had it, was legally exercised.

There are in the books many cases, in which the nature and extent of such an authority are discussed and illustrated. 1 Mass. Rep. 172, *Hall* v. *Gorder* ; 4 Taunt. 876, *Gye* v. *Felton* ; 6 Cowen, 658, *Hamilton* v. *Eaton* ; 5 Pick. 250, *Butler* v. *Hubbard* ; 19 Johns. 113, *Nickerson* v. *Howard* ; 7 Mass. Rep. 145, *Day* v. *Everett* ; 13 Johns. 270 ; 8 ditto, 328 ; Com. Dig. Justices of the Peace, B 56 ; 2 Cowen, 537 ; 5 ditto, 363 ; 2 Pick. 451, *Powers* v. *Ware* ; 1 Salkeld, 68 ; 2 Strange, 1266 ; 6 Mass. Rep. 273 ; 8 ditto, 299.

But in order to determine the validity of the indentures in this case, it is necessary, in the first place, to see by what laws that validity is to be settled. The contract was made in Vermont. But the child, who was the subject of the contract, was at the time resident in this state, and as the the plaintiff to whom the child was to be bound was an inhabitant of this state, it cannot admit a doubt that the contract was made with a view to be executed here. Dyer was a member of the society of Shakers in Enfield. He had been long, and still remains, permanently settled and stationed there. The child, while in his service, was resident there. Indeed,

it is beyond dispute, that the child was to be brought up in the society.

The general rule is, that the law of the place where the contract is made is to govern as to its nature, validity, construction and effect. But if, from the terms or nature of the contract, it appears that it was to be executed in another country, then the place of making the contract becomes immaterial, and the validity of the contract must be tested by the laws of the place where it is to be executed. 17 Johns. 511, *Fanning* v. *Consequa*; 4 Cowen, 511; 2 Johns. 235, *Smith* v. *Smith*; 1 Gallison, 375; 1 Johns. 93, *Ludlow* v. *Van Renselaer.*

The question is, then, whether this case is to be governed by the rule, or by the exception? On this question we think there is no room for doubt. The indentures were made in Vermont, but we have no doubt that it was the understanding of the parties that the contract was to be executed in this state. The case is, then, within the exception to the general rule, and the question, whether the contract be valid, is to be settled by the laws of this state.

If the validity of the contract is to be settled by the laws of this state, then the question is, by what law this overseer of the poor, in the town of Norwich, was authorized to bind this child here? The overseers of the poor in the respective towns in this state are authorized by statute to bind out as apprentices such children as are chargeable to such towns. But we are not aware of any law which authorises the overseer of the poor of towns out of the state to bind children here.

If all the parties to the contract had been resident in Vermont at the time it was made, and it had been intended to be executed in Vermont, and the plaintiff had afterwards removed to this state with the apprentice and settled here, it is by no means clear, that the apprentice could have been holden here. It is not settled that a master can carry an apprentice with him out of

Dyer
*v.*
Hunt et a.

the state where the contract is made, without the consent of all the parties concerned. 1 Mass. Rep. 180 ; 6 ditto, 273 ; 8 ditto, 305—306.

But however this may be, we are all of opinion that an overseer of the poor in Vermont, as such, has no authority by the laws of this state to bind any person as an apprentice, and that the indentures in this case are void.